**IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSEPH LUCKY, | ) |
| | ) |
| Plaintiff, | )       **Civil Action No.** |
| | ) |
| v. | ) |
| | ) |
| TRANS UNION, LLC, EQUIFAX | ) |
| INFORMATION SERVICES LLC, | ) |
| EXPERIAN INFORMATION | ) |
| SOLUTIONS, INC. and WELLS | ) |
| FARGO & COMPANY | ) |
| | ) |
| Defendants. | ) |
| | ) |

<u>**COMPLAINT**</u>

1.    Defendants, Trans Union, LLC, Equifax Information Services LLC, and Experian Information Solutions, Inc., national consumer reporting agencies ("CRA"), have been selling credit reports inaccurately marking Plaintiff as deceased.  When they inaccurately report a living consumer as deceased Defendants makes it practically impossible for that consumer to access credit, as they did with Mr. Lucky.  Defendants' practice also harms the businesses that purchase their reports; as such companies cannot process credit applications due to the applicant's lack of a credit score.  There is no good faith rationale to explain Defendants' practice other than the generation of revenue.  If Defendants actually believed that Mr. Lucky was deceased, they had no legally permissible basis to sell his reports.  If Defendants believed Mr. Lucky was alive, they knowingly sold his reports with a gross inaccuracy.  Moreover, Defendants know that identity thieves use the credit information of truly deceased persons to commit credit fraud.  Defendants thus violated Plaintiff's rights under the Fair Credit Reporting Act ("FCRA"), as set forth below.

## JURISDICTION AND VENUE

2.      Jurisdiction of this court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

3.      Venue lies properly in this district pursuant to 28 U.S.C. § 1391 (b).

## PARTIES

4.      Plaintiff Joseph Lucky is an adult individual residing in Sweet Home, OR.

5.      Defendant Trans Union, LLC (hereafter "Trans Union") is a business entity that regularly conducts business in the Eastern District of Pennsylvania, and which has a principle place of business located at 1510 Chester Pike, Crum Lynne, Pennsylvania 19022.

6.      Defendant Equifax Information Services, LLC (hereafter "Equifax") is a business entity that regularly conducts business in the Eastern District of Pennsylvania, and which has a principle place of business at 6 Clementon Road, East, Suite A2, Gibbsboro, New Jersey 08026.

7.      Defendant Experian Information Solutions, Inc. (hereafter "Experian") is a business entity that regularly conducts business in the Eastern District of Pennsylvania, and which has a principal place of business located at 5 Century Drive, Parsippany, New Jersey 07054.

8.      Defendant Wells Fargo & Company ("Wells Fargo") is a business entity that regularly conducts business in the Eastern District of Pennsylvania, and which has a principal place of business located at 420 Montgomery St., San Francisco, CA 94104.

## FACTUAL ALLEGATIONS

*Defendants' TransUnion, Experian and Equifax's Practices Concerning the Sale of Reports on the "Deceased"*

9.      Defendants are regulated as "consumer reporting agencies" ("CRA") under the FCRA.  15 U.S.C. § 1681a(e).

10.     Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.  15 U.S.C. § 1681a(e).

11.     Pursuant to the FCRA, Defendants must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy."   15 U.S.C. § 1681e(b).

12.     Pursuant to the FCRA, Defendants must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."  15 U.S.C. §§ 1681e(a) & 1681b.

13.     Defendants place a "deceased" notation or marking on reports when they are advised from any of their many data furnishing sources that a given consumer is deceased.

14.     The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

15.     Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

16.     Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's reports.

17.     Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

18.     A deceased notation is a very unusual marking upon a credit file or credit report.

19.     In some cases, in order to assure accuracy, Defendants send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Trans Union, Equifax, and

Experian credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado.  But Defendants have no similar procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Defendants to be placed in said consumer's credit file or report.

20.     Defendants regularly receive the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased.   But Defendants do not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

21.     Defendants will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

22.     Indeed, Defendants employ no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

23.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants employ no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

24.     Even in instances where the purportedly deceased consumer communicates directly with Defendants, Defendants employ no procedures which assure that a consumer with a

4

"deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

25.     Once a "deceased" mark is placed upon a consumer's report, Defendants will not calculate and will not provide a credit score for that consumer.

26.     Nevertheless, Defendants routinely sell to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

27.     Upon Defendants' reports with a "deceased" mark sold to third parties Defendants never calculate or provide a credit score for that consumer.

28.     Defendants know that third party credit issuers use a credit score in order to process a given credit application.

29.     Defendants know that many third party credit issuers require a credit score in order to process a given credit application.

30.     Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

31.     Defendants know that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

32.     Defendants have been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

33.     Defendants have received and documented thousands of disputes from consumers complaining that their Trans Union, Equifax, and Experian credit reports have them erroneously marked as "deceased."

34.     Defendants know that thousands of consumers are erroneously marked as "deceased" on their Trans Union, Equifax, and Experian credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

35.     Nevertheless, Defendants employ no procedures which assure that a consumer marked as "deceased" on one of Defendants' reports is, in fact, deceased.

36.     Even consumers who dispute the erroneous "deceased" status on their Trans Union, Equifax, and Experian credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

37.     Defendants have no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

38.     Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

39.     For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

40.     Defendants will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Trans Union, Equifax, and Experian – meaning that nobody is continuing to buy those reports from Trans Union, Equifax, and Experian.

41.     Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

42.     Defendants profit from the sale of reports on the deceased.

43.     Defendants have in its credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

44.     Defendants know that truly deceased consumers do not apply for credit.

45.     Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud.  Indeed, identity theft using the personal identifying information of deceased consumers is known to Trans Union, Equifax, and Experian to be a common and major source of identity theft.

46.     Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

47.     Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

48.     Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

49.     Indeed, Defendants sell reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a

"permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

50.     For consumers who are deceased, there exists no permissible purpose under the FCRA for Defendants to ever sell their credit reports, absent a court order.

51.     Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### Case Specific Facts As To All Defendants

52.     Plaintiff had been marked by Defendants as "deceased" on his Trans Union, Equifax, and Experian credit reports.

53.     Plaintiff is not deceased.

54.     Defendants did not calculate or provide any credit score for or on Plaintiff, even though it sold reports about him to third parties marking him as "deceased."

55.     Plaintiff has disputed the deceased notation with Defendant Trans Union following Trans Union's established procedures for disputing consumer credit information.

56.     Plaintiff has disputed the deceased notation with Trans Union from at least December 2013 through the present.

57.     Notwithstanding Plaintiff's disputes, Wells Fargo has also failed to conduct timely and reasonable investigations of Plaintiff's disputes after being contacted by the relevant credit reporting agencies concerning Plaintiff's disputes, and has willfully continued to report such inaccurate information to various credit reporting agencies.

58.     Notwithstanding Plaintiff's efforts, Defendants continue to publish and disseminate such inaccurate information to other third parties, persons, entities and credit

8

grantors.  Defendants have repeatedly published and disseminated consumer reports to such third parties.

59.     As a result, Defendants made it practically impossible for Plaintiff to obtain credit.

60.     As a result of Defendants' conduct, Plaintiff has suffered actual damages in the form of credit denial or loss of credit opportunity, credit defamation and emotional distress, including anxiety, frustration, embarrassment and, humiliation.

61.     At all times pertinent hereto, Defendants were acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

62.     At all times pertinent hereto, the conduct of the Defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## CLAIMS

## COUNT ONE – EQUIFAX, EXPERIAN, & TRANS UNION VIOLATIONS OF THE FCRA

63.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

64.     At all times pertinent hereto, Defendants were "persons" and a "consumer reporting agencies" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

65.     At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

66.     At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

67.     Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Trans Union, Equifax, and Experian are liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. § 1681e(b).

68.     The conduct of Defendants was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Defendants are liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## COUNT THREE – WELLS FARGO
## VIOLATIONS OF THE FCRA

69.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

70.     At all times pertinent hereto Defendant was a "person" as that term defined by 15 U.S.C. § 1681a(b).

71.     Defendant violated sections 1681n and 1681o of the FCRA by willfully and negligently failing to comply with the requirements imposed on furnishers of information pursuant to 15 U.S.C. § 1681s-2(b).

72.     Defendant's conduct was a direct and proximate cause, as well as a substantial factor, in causing the serious injuries, damages and harm to the Plaintiff that are outlined more fully above, and as a result Defendant is liable to compensate Plaintiff for the full amount of statutory, actual and punitive damages, along with attorneys' fees and costs, as well as such other relief, permitted by law.

73.

## JURY TRIAL DEMAND

74.     Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against the

Defendants, based on the following requested relief:

      (a)     Actual damages;

      (b)     Statutory damages;

      (c)     Punitive damages;

      (d)     Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and

              1681o; and

      (e)     Such other and further relief as may be necessary, just and proper.

                    Respectfully Submitted,

                    **FRANCIS & MAILMAN, P.C.**

            BY:    */s/ Mark Mailman*
                    MARK MAILMAN, ESQUIRE
                    GREGORY GORSKI, ESQUIRE
                    Land Title Building, 19th Floor
                    100 South Broad Street
                    Philadelphia, PA 19110
                    (215) 735-8600

                    Attorneys for Plaintiff

Dated:  September 5, 2014